NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Bankruptcy Case No. 09-32214 |
| William H. Hoefling, | Chapter 7 |
| Debtor. | |
| RBC Bank (USA), | |
| Plaintiff, | |
| vs. | Adversary No. 09-2669 |
| William H. Hoefling, | |
| Defendant. | **MEMORANDUM OPINION** |
| | Trial Dates: 11/9/10, 11/23/10, 12/16/10, and 1/13/11 |

**APPEARANCES**

Attorneys for Plaintiff
Karl J. Norgaard, Esquire
Stern, Lavinthal, Frankenberg & Norgaard, LLC
184 Grand Avenue
Englewood, New Jersey 07631

Attorney for Defendant
Timothy P. Neumann, Esquire
Broege, Neumann, Fischer & Shaver, LLC
25 Abe Voorhees Drive
Manasquan, New Jersey 08736

**Procedural History**

On August 25, 2009 William H. Hoefling (the "Debtor") filed a voluntary chapter 11 petition. On April 26, 2010 the court converted the Debtor's case to a Chapter 7 proceeding pursuant to 11 U.S.C. §1112(b), on the trustee's motion. Creditor RBC Bank USA ("RBC") filed this Adversary proceeding on October 22, 2009, and seeks a finding by this Court that the approximately $753,000 secured claim owed by the Debtor is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(B)[1].

This Court granted partial summary judgment on October 22, 2010 with regard to 11 U.S.C. section 523(a)(2)(B)(i) and 11 U.S.C. section 523(a)(2)(B)(ii), finding that the Debtor obtained money, property or services, or an extension, renewal, or refinancing of credit from the RBC through the use of a materially false, financial statement in writing, which is the "Uniform Residential Loan Application" (the "New Application") submitted by the Debtor in connection with a Modified Note executed on March 1, 2008. The court's October 22, 2010 opinion on the motion for summary judgment (incorporated in this opinion) narrowed the issues to be determined at trial to:

> a. whether Plaintiff/Creditor reasonably relied on the Debtor/Defendant's materially false, written financial statement, described in paragraph 1 above, as contemplated by 11 U.S.C. section 523(a)(2)(B)(iii);
> b. whether the Defendant/Debtor caused or made to be published the materially false financial statement in writing, described in paragraph 1 above, with intent to deceive the Plaintiff/Creditor as contemplated by 11 U.S.C. section 523(a)(2)(B)(iv).

This opinion expresses the Court's findings at trial with regard to these specific issues.

---

[1] The adversary complaint does allege a violation of § 523(a)(2)(A), which excepts a discharge for an extension, renewal, or refinancing of credit, to the extent obtained, by--(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's financial condition. The focus of the trial and pleadings is on the debtor's New Application, a statement respecting the debtor's financial condition.

**Factual Background**

The Debtor and his Wife, Carol Hoefling obtained a mortgage from RBC[2] for real property located at 19877 Markwood Crossing in Estero, FL 33928 (the "Florida Property") on November 30, 2006. In conjunction with this mortgage, the Debtor obtained a "Construction/Permanent Loan Agreement" with a maximum allowable amount of $856,183 and an interest rate of 8.25%. On the same date, the debtor executed an "Interest Only Adjustable Rate Note," (the "original note") which required the debtor to make payments beginning on January 1, 2008. This was based, in part, on the November 21, 2006 Residential Appraisal Review Form that appraised the Florida Property at $1,071,000. In order to obtain approval for the original note, the Debtor executed a "Uniform Residential Loan Application" that was neither dated nor signed by the debtor's wife.

**A.  The Original and New Uniform Residential Loan Applications**

The debtor and his wife then signed a "Uniform Residential Loan Application," (the "New Application") that is not dated. The first page of the New Application differed from the original application as follows: (1) Amount $765,000 instead of $856,183 (-11%); (2) Interest rate 6.25% instead of 8.25%; (3) the Debtor's Wife was added as a borrower; (4) the Debtor was listed as living at his Basking Ridge, NJ home for thirteen years rather than five; (5) the Debtor was listed as having been employed by Crystal Pond Capital Group for 5 years rather than 3

---

[2] All transactions were between the Debtor and the Community Bank of Naples, N.A.  It was publicly announced on September 6, 2007 and RBC received approval from the Federal Reserve Board of Governors on February 5, 2008 to acquire the parent Bank Holding Company of the Community Bank of Naples.  RBC Centura Acquires Alabama National Bancorporation (Sept. 6, 2007), http://www.rbcbankusa.com/mediainformation/cid-101926.html; see also Federal Reserve Board Bulletin, Order Approving the Acquisition of a Bank Holding Company, Vol. 94 (Feb. 5, 2008), http://www.federalreserve.gov/pubs/bulletin/2008/legal/q108/order4.htm#f4-29.  This opinion will refer to the Community Bank of Naples under the name of its successor, RBC.

years, 10 months; (6) the Debtor is listed as having been employed in this line of work/profession for 35 years rather than 3; and (7) the "original cost" is listed as $1,145,145 compared to the "cost" of $1,070,229 on the original application. Differences on the second page of the New Application include: (1) monthly income decreased from $42,008 to $30,000 (-29%); (2) monthly expenses decreased from $8,822.00 to $6,043.57; (3) subtotal liquid assets increased from $535,656.80 to $8,860,252.85[3]; (4) total assets decreased from $12,111,822.80 to $11,457,949.45 (-5.4%); (5) total monthly payments for outstanding liabilities increased from $10,396 to $31,272 (+300%); (6) total liabilities increased from $1,750,553 to $2,294,915 (+31.1%); and (7) total net worth decreased from $10,361,269.80 to $9,163,034.45 (-11.6%). The third page of the new application included the following changes: (1) the value of Debtors residence located at 335 Old Army Road, Basking Ridge, NJ 07920 decreased from $2,500,000 to $1,500,000[4]; (2) the amount of the mortgage/liens against the Debtors primary residence decreased from $1,509,789 to $1,471,276; (3) the monthly mortgage payments for the primary residence decreased from $8,882 to $8,465; (4) real property located at 19877 Markwood Crossing, Estero, FL was added with a $1,000,000 present market value with an outstanding mortgage of $755,000[5]; and (5) the total loan amount decreased from $856,183 to $765,000 (-11%).

---

[3] On the original application $9,076,166 is listed as a vested interest in a retirement fund. On the new application, there is $8,662,185 in a "checking account," which includes the debtors retirement account.

[4] On the original application, the debtor's primary residence in Basking Ridge, NJ had a present market value of $2,500,000. On the new application, the Basking Ridge, NJ home had a present market value of $1,500,000 and the Florida Property was listed with a present market value of $1,000,000. The new application also recognized the Florida Property as the debtors primary location.

[5] The February 5, 2008 appraisal provided by RBC, which lists the loan amount at $775,000. This appraisal was reviewed by a Credit Analyst at RBC on April 4, 2008.

The formatting of the first three pages of both applications make the content readily comparable. The fourth and fifth pages of the new application, titled "Continuation Sheet/Residential Loan Application," however, are wholly different from the original application. The fourth and fifth pages of the original application detail the Debtor's outstanding liabilities, which totaled $1,750,553. In contrast, the fourth page of the new application identifies five different checking accounts held by the Debtor, including one account at JP Morgan Chase with $8,662,185, with all five totaling $8,725,180.66. The fifth page of the new application identifies six revolving debt accounts and three real estate loans, which total $2,294,915. Notably, on December 21, 2007 the Vice President of Community Bank of Naples, N.A. requested via email a 90 day renewal on the Hoefling's account because they "are in the process of relocating and not yet in receipt of all of their required financial information." Further, RBC alleges that it knew the new application contained some "minor errors." Motion for Summary Judgment in favor of RBC Bank at 6, RBC Bank USA v. William H. Hoefling (In re Hoefling), No. 09-02669 (Bankr. D.N.J. Sept. 13, 2010). The debtor testified that when he signed these documents, they were blank. Trial Transcript at 50, RBC Bank USA v. William H. Hoefling (In re Hoefling), No. 09-02669 (Bankr. D.N.J. Nov. 9, 2010).

**B. The Gambling Debt**

Not included in the New Application was $540,000 in gambling debt incurred by the Debtor from October through December of 2007 at casinos in Atlantic City, NJ. At trial, a manager in the outstanding debt collection at Harrah's Entertainment, a witness called by RBC, testified that casinos do not report their gambling debts to the consumer credit agencies. Trial Transcript at 19, RBC Bank USA v. William H. Hoefling (In re Hoefling), No. 09-02669 (Bankr. D.N.J. Nov. 9, 2010). RBC was aware that the debtor had reported $3,000 in gambling losses on

5

his 2006 Federal Income Tax return. Trial Transcript at 148, <u>RBC Bank USA v. William H. Hoefling</u> (<u>In re Hoefling</u>), No. 09-02669 (Bankr. D.N.J. Nov. 9, 2010). However, the RBC manager indicated that the only way to determine if the debtor had any gambling debts would have been if the debtor disclosed the information to RBC. Trial Transcript at 118, <u>RBC Bank USA v. William H. Hoefling</u> (<u>In re Hoefling</u>), No. 09-02669 (Bankr. D.N.J. Nov. 9, 2010). This contrasts with the testimony from the Harrah's Entertainment manager who indicated that New Jersey casinos must report gambling debt to Central Credit Las Vegas. Trial Transcript at 25, <u>RBC Bank USA v. William H. Hoefling</u> (<u>In re Hoefling</u>), No. 09-02669 (Bankr. D.N.J. Nov. 9, 2010).

**C. RBC and Industry Standards**

Testimony by the former RBC manager indicated that RBC followed standard industry procedures when executing the modified note. Trial Transcript at 33, <u>RBC Bank USA v. William H. Hoefling</u> (<u>In re Hoefling</u>), No. 09-02669 (Bankr. D.N.J. Nov. 9, 2010). In accordance with industry standards, RBC sought: bank statements, income tax documents, pay stubs, W-2 forms, and credit reports. <u>Id.</u> Following receipt of these documents, if RBC needed more information or further verification, RBC would obtain "secondary sources of credit" from credit agencies other than Experian, TransUnion, and Equifax credit reporting companies. <u>Id.</u> at 20. RBC indicated that this is also standard industry practice. <u>Id.</u>

**D. The Modified Note**

The March 1, 2008 Adjustable Rate Note (the "Modified Note") identifies the Florida Property and decreases the obligation of the promissory note from $856,183 to $775,000. The major difference between the Modified Note and the original note is that calculation of the

6

interest rate is different.[6] RBC admits that the terms of the initial loan "did not meet secondary market guidelines," meaning the original note could not be pooled and securitized into a residential mortgage backed security. RBC Bank USA v. William H. Hoefling (In re Hoefling), No. 09-02669 (Bankr. D.N.J. Sept. 13, 2010). Following RBC's approval of the new application and modification of the original note, the loan was "of sufficient quality that the Bank would portfolio the loan." Motion for Summary Judgment in favor of RBC Bank at 5, RBC Bank USA v. William H. Hoefling (In re Hoefling), No. 09-02669 (Bankr. D.N.J. Sept. 13, 2010). This means that following the modification and securitization of the debtors original loan, RBC could sell the debtors mortgage and would no longer retain the risk of the debtor's default on his new loan.

Prior to approving the Modified Note, the Bank Officer, Mr. Joe Sakmar, completed a "Retail Debt Ratio Worksheet" (the "Debt Worksheet"), dated February 27, 2008. According to RBC, this is a "reflection" that a credit report was obtained in connection with RBC's decision to execute the Modified Note. The Court was not provided with this credit report. The worksheet identifies the debtor as having a risk rating of "E" on a scale from A to I, which is "fair." This rating was reached by dividing the debtors "total monthly payments" by the "total gross income," which was 40.75%. That rating was slightly over the 40% minimum allowed for the bank to approve the loan. See Motion for Summary Judgment in favor of RBC Bank at 8-9, RBC Bank USA v. William H. Hoefling (In re Hoefling), No. 09-02669 (Bankr. D.N.J. Sept. 13, 2010). The worksheet incorrectly identifies the loan amount as $750,000. The worksheet lists "total payments" of $20,604, but only identifies an illegible new loan payment, $1,332.33 in tax

---

[6] The interest rate on the Modified Note is different as follows: (1) the range of possible interest rates is narrower; (2) the interest rate is based on U.S. Treasury Securities rather than LIBOR; and (3) the date of the first interest rate adjustment is different.

and "Loans" of $12,297. The worksheet also lists a total gross monthly income of $44,778. There is also a "compensating factors" hand written portion, which reads "home in NJ is being sold will [sic] DR (debt ratio)" and "8+ million in liquid assets." In addition, the Community Bank of Naples obtained an appraisal of the Florida Property dated February 6, 2008, which RBC did not review until April 4, 2008.

The Plaintiff also provided to the court a letter (the "Letter") with the Community Bank of Naples, N.A. letterhead that is untitled, but is dated February 26, 2008. The Letter states:

> Mr. and Mrs. Hoefling are requesting that we term out their existing construction loan with Community Bank. Mr. Hoefling is a retired Senior VP of Chase, JP Morgan he has over 8 Million in differed [sic] Compensation from Chase. They are in the process of selling their New Jersey home to their daughter and becoming full time residents here in Naples Florida.
>
> Based on reserves, ratios, collateral and prior experience with Community Bank approval is requested.

The Letter was signed by Mr. Joe Sakamr (without a date), Mr. Greg Murphy (dated 2/28/08), and someone with the initials D. B. (dated 3/13/08). Interestingly, this letter lists the annual income of the debtor as $537,336, a number that is qualified by adjacent parenthesis that state "2 year average." RBC also included a "Uniform Underwriting and Transmittal Summary" (the "UUTS") that is dated 2/26/08 and properly identifies the property location. However, the UUTS states that the appraised value is $1,500,000. Similarly, the UUTS lists the debtors income as $30,000 but handwritten next to this number is $44,778.

## Legal Analysis

The debtor in the instant case seeks a discharge pursuant to 11 U.S.C. § 727, portions of which may be excepted, as sought by RBC, if the elements of 11 U.S.C. § 523(a)(2)(B) are met. Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors. Kay Berry, Inc. v. Pearman (In re Pearman), 432 B.R. 495, 500 (Bankr. D.N.J. 2010)

(citing In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995)).  Accordingly, the burden of proving that a debt is nondischargeable under § 523(a) is upon RBC, which must establish entitlement to an exception by a preponderance of the evidence.  See Ins. Co. of N. Am. v. Cohn (In re Cohn), 54 F.3d 1108, 1114 (3d Cir. 1995) (citing Grogan v. Garner, 498 U.S. 279, 287-288 (1991)).  Based on October 22, 2010 partial summary judgment entered by this court, it was already proven that the debtor obtained a debt for money, property, services or an extension, renewal, or refinancing or credit obtained by the use of a statement in writing that was materially false and was respecting the debtor's financial condition.  See 11 U.S.C. §§523(a)(2)(B)(i),(ii).  Thus, RBC needed to prove at trial subparts (iii) and (iv) of 11 U.S.C. §523(a)(2)(B) at trial in order for this court to find the debt at issue non-dischargeable.

### A.  11 U.S.C. §523(a)(2)(B)(iii)

RBC needed to prove at trial that the debtor used a statement in writing "on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied."  11 U.S.C. § 523(a)(2)(B)(iii).  The "reasonably relied" requirement requires not only that RBC's reliance be reasonable, but also that RBC actually relied on the note modification. Cohn, 54 F.3d at 1115.  This subtle but important distinction is important in light of the long recognized duty of the court "to give effect, if possible, to every clause and word of a statute." United States v. Menasche, 348 U.S. 528, 538-539 (1955) (citing Montclair v. Ramsdell, 107 U.S. 147, 152 (1883)).  Therefore, in order to find a debt non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(B), this Court must find both that RBC actually relied on the materially false new application and that such reliance was or would have been reasonable.

### 1.  RBC did not prove Actual Reliance on the New Application

RBC did not prove by a preponderance of the evidence that it actually relied on the New Application when deciding to execute the Modified Note.  The only benefit to the debtor from the modified note is that the stated initial interest rate was lowered from 8.25% to 6.25%.  The major benefit of this transaction to RBC was that it was able to offer the debtor's mortgage to third party investors (referred to by RBC as "the secondary mortgage market").  Not only did RBC not prove that actual information on the new application was relied on to execute the modified note, but RBC proved to this court that certain information on the new application was either disregarded or known to be false.  For example, the new application was not used to prepare the Debt Worksheet as shown by the following: (1) both documents do not have the same loan amount; (2) total monthly payments on the Debt Worksheet lists $20,604, a number that is nowhere on the new application; and (3) $8,000,000+ in liquid assets.  According to RBC's Trial Brief, RBC was aware of the "minor error" that the debtor's deferred compensation is not a liquid asset, despite its recognition as such on the Debt Worksheet.  If RBC was so aware, then it could not have relied on the incorrect information contained in the new application.  Furthermore, the new application clearly indicates that the debtor owns his residence in Basking Ridge, NJ.  RBC chose not to rely on this fact when executing the modified note, indicated in a letter that the debtor is "in the process" of selling his NJ home.  The Debt Worksheet also suggests that the "home in NJ is being sold."

Similar to the Debt Worksheet, the New Application was not used to complete the UUTS as shown by the incorrect appraisal value and incorrect debtors income.  The UUTS lists that the appraised value of the Florida home is $1,500,000 in contrast to the $1,000,000 on the New Application.  Further, the new application lists the debtors monthly income as $30,000 and the

UUTS states a "salary" of $44,778. Neither of these numbers came from the New Application. RBC failed to prove to this court that it relied on the New Application to execute the Modified Note in favor of the debtor. RBC also failed to prove that the UUTS and Debt Worksheet relied on the new application, supporting this Court's finding that RBC did not actually rely on the New Application. Accordingly, the Court finds that RBC did not successfully prove by a preponderance of the evidence that it actually relied on the New Application when it executed the Modified Note.

### 2. Even if RBC had proven actual reliance on the New Application, did not prove reliance would have been reasonable.

RBC failed to prove by a preponderance of the evidence both that it could have reasonably relied on the New Application when executing the Modified Note. In the Third Circuit, a court determination of whether reliance on a materially false written financial statement is reasonable for the purposes of 11 U.S.C. § 523(a)(2)(B)(iii) requires consideration of three factors:

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices);
> (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and
> (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

Cohn at 1117-1118 (citing Coston v. Bank of Malvern (In re Coston), 991 F.2d 257, 261 (5th Cir. 1993) (en banc); Lesman v. Mitchell (In re Mitchell), 70 B.R. 524, 527-28 (Bankr. N.D. Ill. 1987); In re Martz, 88 B.R. 663, 673-74 (E.D. Pa. 1988)).

RBC failed to prove by a preponderance of the evidence that any of the three Cohn factors would support a finding that if RBC had relied upon the new application, which it did

not, such reliance would have been reasonable. RBC failed to present to the court any documentation regarding: (1) how long the Debtor lived at his Basking Ridge, NJ home; (2) how long the Debtor was employed by Crystal Pond Capital Group; (3) how long the Debtor was employed in his line of work/profession; (4) why or how the Debtor's monthly income decreased by 29% to $30,000; (5) why or how the Debtor's monthly expenses decreased by 31% to $6,043.57; (6) why or how total monthly payments for outstanding liabilities increased from $10,396 to $31,272 (+300%); (7) why or how total liabilities increased from $1,750,553 to $2,294,915 (+ 31.1%); (8) why or how the Debtor's total net worth decreased from $10,361,269.80 to $9,163,034.45 (-11.6%); (9) the value of Debtors primary residence located at 335 Old Army Road, Basking Ridge, NJ 07920 decreased from $2,500,000 to $1,500,000; and (10) why the monthly mortgage payments for the primary residence decreased from $8,882 to $8,465. These ten undocumented facts were included on the new application and differed from the original application. Seeking additional information or documentation to verify this information would have been in accordance with RBC and industry standard practices, as testified by a former RBC employee. Therefore, analysis of the first two <u>Cohn</u> factors reveals that if RBC had relied on the New Application, such reliance would have been unreasonable.

With regard to the third <u>Cohn</u> factor, the following red flags that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate: (1) 29% decrease in monthly income; (2) a 31% decrease in monthly expenses; (3) a 1654% increase in liquid assets; and (4) Gambling losses on the debtors 2006 Federal Income Tax Return. The following are obvious inaccuracies on the new application: (1) the borrower went from having lived in Basking Ridge, NJ for five years to thirteen years; (2) the loan on the new application was listed with the wrong amount; (3) the value in the debtors Basking Ridge, NJ home decreased by $1,000,000;

and (4) the 1654% increase in liquid assets. Reporting gambling losses on a tax return is a red flag that indicates to a mortgage lender a potential borrower may have gambling debt. RBC could have discovered the debtor's gambling habits or gambling debts with a minimal investigation. The overall circumstances surrounding the Modified Note and New Application, lead to the conclusion that if RBC had relied on the new application in executing the modified note, doing so would not have been reasonable.

In addition to this Courts finding that RBC did not prove that it actually relied on the new application when executing the modified note, the court also finds that even if RBC had relied on the new application, such reliance would not have been reasonable. Since RBC has failed to prove 11 U.S.C. §523(a)(2)(B)(iii) by a preponderance of the evidence, the court makes no finding with regard to the Debtors intent pursuant to 11 U.S.C. §523(a)(2)(B)(iv).

## Conclusion

RBC failed to prove by a preponderance of the evidence that it actually and reasonably relied on the factual assertions of the New Application. Thus, RBC's non-dischargability action against the Debtor fails because RBC did not prove the existence of the elements as required by 11 U.S.C. §523(a)(2)(B)(iii). Therefore, this Court holds that the debt at issue in the instant case will be discharged under 11 U.S.C. §707.

Debtors counsel shall submit form of judgment consistent with this opinion.

*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated:  May 23, 2011